Nancy Carolyn FRAZIER, Appellant,

v.

EMPLOYERS MUTUAL CASUALTY COMPANY, Appellee.

No. 11097.

Court of Civil Appeals of Texas.
Austin.

June 12, 1963.

Rehearing Denied July 3, 1963.

Arthur Mitchell, Sam Houston Clinton, Jr., Austin, for appellant.

Strasburger, Price, Kelton, Miller & Martin, Royal H. Brin, Jr., Dallas, for appellee.

HUGHES, Justice.

This is a Workmen's Compensation case in which the jury, having failed to agree upon answers to any of the special issues submitted to it, was discharged and judgment rendered, upon appellee's Motion, that appellant, Nancy Carolyn Frazier, take nothing by her suit. Appellee, the insurance carrier, is Employers Mutual Casualty Company.

The basis of appellee's motion for judgment was that there was no evidence to support a jury finding that appellant sustained an injury or an accidental injury on July 31, 1961, the date of the alleged injury, within the meaning of such terms as used in the Workmen's Compensation Act.

The specific contention of appellee is that the disability of which appellant complains was brought on gradually by the nature of her work and her physical and emotional state which cannot be traced to any definite time or place.

We accept the following statement from Solomon v. Massachusetts Bonding and Insurance Company, 347 S.W.2d 17, San Antonio Civil Appeals, writ ref., as correctly reflecting the rule of law to be applied by us to the facts of this case:

"An industrial accident or accidental injury is distinguished from an occu-

pational disease by the following characteristics: An industrial accident or accidental injury can always be traced to a definite time, place and cause, whereas an industrial disease is of slow and gradual development, and the time, place and cause thereof are not susceptible of definite ascertainment."

There is no claim here for disability resulting from an occupational disease.

We will recite the facts fully, but as briefly as possible, to show the nature of and circumstances attending the illness or disability from which appellant suffered and continues to suffer.

Appellant was 29 years of age in 1962. She is divorced. She has a nine year old child. She is a high school graduate with two years training in a business college. After doing filing and secretarial work for several years, appellant was employed by radio station KNOW in Austin in 1957, where her employment continued until 1962 when she became unable to perform her duties as an employee.

During her first three years with KNOW as receptionist-secretary, appellant performed her duties satisfactorily and without difficulty. In 1960, she was assigned to and put in charge of "traffic." In radio language this meant that she must arrange and "log," or schedule, the material to be broadcast, fitting it to a second-by-second timetable. She had to type the finished "log." The work was exacting; it increased her duties and responsibilities.

In July 1960, appellant experienced "tightness" in her neck. She consulted a physician who prescribed medication.

In October 1960, KNOW changed its broadcasting pattern with the result of an increase in its business. The "traffic" duties of appellant were doubled. She found it necessary to take work home with her at night. The pace of her work became faster. She was under more tension and pressure. This increased her anxiety. She became nervous.

In January 1961, appellant experienced more pain in her neck, and was unable to hold her head erect.

In June 1961, appellant took a two weeks vacation. Upon her return she found that her work had been disarranged by her replacement. This required extra work by appellant, and she was compelled to take home night work, and she had to work on some week ends.

About July 20, 1961, KNOW increased its daily broadcasting hours from 18 to 24. This added to appellant's work.

During the week before Monday, July 31, 1961, appellant had not taken any work home with her because, "I had reached a point where I was so completely exhausted that I went home * * * and was in bed around 6:00 o'clock. I had to or I couldn't have gotten up the next morning." Appellant did not miss time from her work. She worked all day Saturday, July 29, and Sunday, July 30. She collapsed at her place of work shortly after noon Monday, July 31st. We quote appellant's testimony concerning her collapse:

"Q   What time of day was it, Mrs. Frazier?   .

"A   It was between 1:15 and 1:20 p. m.

"Q   During the day?

"A   Yes.

"Q   Where were you?

"A   I was at the front reception desk at KNOW.

"Q   That is the same KNOW that Mr. Cook has told us about; is that correct?

"A   Yes.

"Q   What did occur specifically at that time, Mrs. Frazier?

"A   It was my custom to go out on the front reception desk and relieve the girl who ordinarily stayed out there all day while she

went to lunch. She went to lunch from 12:30 to 1:30, and I was to take my work and go out there and answer the phone and take care of the desk while she was away, and do whatever I could on my work at that time. I was sitting there typing and answering the phone and just ordinary work. I was suffering a great deal of pain at the time.

"Q Where was this pain?

"A It was in my neck, and in my back, and in my arms.

"Q All right.

"A Approximately fifteen minutes until one, I would say around that time, I placed a call to Dr. Alexander. At this time he had me on some medicine. * * * I called Dr. Alexander, and I told him— I said, 'I just can't make it any longer, Dr. Alexander.' At first he didn't recognize my voice, and he said, 'Is this you, Miss Frazier?' And I said, 'Yes, it is.' And he said, 'What is wrong?' And I said, 'I am suffering death. I just can't stand it any longer. I have either got to have some stronger medicine or I just can't work.' So he said, 'All right; you go on home and go to bed, and we will put you in the hospital.' I put down the receiver, and at this time I just fell down across my typewriter and my hands went up over the typewriter like this (indicating).

"Q Was your physical condition different after July 31st than it was prior to July 31st?

"A Yes.

"Q In what regard?

"A It was this date that I lost complete control of my neck.

"Q Now, let me ask you this: In what way did you lose control of the muscles in your neck?

"A At the time I collapsed my neck went down on my chest like this, and I couldn't get it up. * * *

"Q The stresses under which you worked exhausted you, and you finally collapsed; is that the idea?

"A Yes; I collapsed.

"Q I beg your pardon?

"A Yes; I collapsed.

"Q And when you collapsed, nothing fell from the ceiling; you didn't hit anything; you were not bruised, or cut, or have any broken bones, or anything like that?

"A No; I was not.

"Q And when you collapsed, you just laid across the typewriter?

"A I fell across it. I didn't have any choice. I couldn't sit up."

Appellant when cross examined as to the time of her injury testified, "It was something that came on me gradually, and it was caused by the tension and the pressure under which I had to work. * * *" She stated that she first noticed she was having "some type of difficulty" in July 1960.

Dr. Richard J. Alexander, appellant's personal doctor and witness, testified as the only medical witness, and at great length. He said that appellant was suffering from spasmodic torticollis. We quote from his testimony:

"A Mrs. Frazier had been having trouble with her back and with her neck for approximately one year. You had to look back in the history, but you could see this thing developing insidiously.

"Q Over a long period of time?

"A I would think it was over approximately a year's period of time.

"Q And it gradually increased?

"A Yes, I think so.

"Q And you mentioned to the jury that her condition was disabling; now, is it the spasmodic torticollis that is disabling?

"A Yes, sir; and the pain.

"Q And the pain?

"A Yes, sir.

"Q And that is what you are basing this disability upon?.

"A Yes, sir.

"Q And nothing else?

"A Well, I think that this is the disability, yes, sir.

"Q Now, if a fellow that is in as bad shape as I am right now got out and started running down the street until he finally collapsed—

"A That's right.

"Q —until he just gave up and pooped out—

"A That's right.

"Q —that would kind of be the culmination of outrunning of my—

"A Resources, that's right.

"Q Yes. And that is the same kind of things that happened here, wasn't it, except it involved both mental and physical?

"A She outran her resources, or she was unable to find the—did not have the ability to carry on. She made a conscious effort to try to carry on, as you would do when you run down the street, but you are not able past a certain point from physical reasons to go on.

"Q Yes; and that is the same type of situation which Mrs. Frazier had.

"A With the—in a sense. You have to recall that there are some basic problems or defects with regard to her neural function or her neck function. I mean, that is involved in this. I think—I would make a distinction between, say, normal physical conditioning measures, which I think you are pointing up, and make a distinction between that and the—explaining your reserves and explaining her reserves in terms of the problem with her neck.

"Q Well, it is a different type of reserve, so to speak, but it is a gradual thing. * * *

"Q When did this disabling condition commence?

"A As best I can determine, the condition—the pain and the disability—not the disability, but the spasm of her neck muscles, began insidiously. You can trace it back approximately one year from the time I first saw her. Now, she reached, I think, a state of disability—an inability to function in her work shortly after I started treating her.

"Q In other words,—

"A I am sort of—the word 'disability' is what—I am not sure what you would classify as disability.

"Q Well, as I understand it, the disability is due to this spasmodic torticollis?

"A Right.

"Q Is that right?

"A That is right.

"Q When did that begin?

"A It began approximately one year before. * * *

"Q Doctor, based upon what you have observed in the some thirty-odd visits that you have had, and based upon your—that is, your personal

knowledge, and based upon your expert training in the field of psychiatry and medicine, do you have an opinion as to whether or not her job and the pressures of her employment, emotional strain, anxieties, and pressures, significantly contributed to the disabling effects which you observed?

"A  I don't see how you can separate the two.  I think you have to use a concept of a chain, and this being one link in the chain.

"Q  Your answer would be 'Yes'?

"A  Yes."

Dr. Alexander had first seen appellant as a patient on July 20, 1961, and again on July 22, and July 26, 1961.

▇▇▇  To hold that appellant, under these facts, has sustained an injury, or an accidental injury, under our Workmen's Compensation Law would be to disregard the distinction which the Legislature has made between an injury and a disease emanating from an occupation.  This is not meant to imply that all occupational diseases are compensable under our statute.  They are not.  Only those meeting the requirements of the statute are compensable under it.  Sec. 25, Art. 8306, V.A.C.S.  Under the evidence appellant has contracted a disease, at least partly, from the work in which she engaged.  As to her, it is an occupational disease.  We are not called upon to decide whether such disease is compensable under our statute because such claim was not and is not made.

In order to hold that appellant has sustained an injury as claimed we would also have to disregard the decisions which hold that an injury or an accidental injury, under the Workmen's Compensation Act, must be traced to an incident occurring at a definite time and place and as the result of a definite cause.  Authorities supra, and Texas Employers Ins. Association v. McKay, 146 Tex. 569, 210 S.W.2d 147.

It is our opinion that the Trial Court correctly concluded that appellant did not sustain an injury or an accidental injury within the meaning of those terms as used in our Workmen's Compensation Act.  We, therefore, affirm its judgment.

Affirmed.